IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KIRK D. THOMPSON, | ) | CASE NO. 1:16CV2203 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| ALAN J. LAZAROFF, | ) | JONATHAN D. GREENBERG |
| Warden | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Respondent. | ) | |

This matter is before the undersigned pursuant to Local Rule 72.2.  Before the Court is

the Petition of Kirk D. Thompson ("Thompson" or "Petitioner"), for a Writ of Habeas Corpus

filed pursuant to 28 U.S.C. § 2254.  Thompson is in the custody of the Ohio Department of

Rehabilitation and Correction pursuant to journal entry of sentence in the case *State v.

Thompson,* Cuyahoga County Court of Common Pleas Case No. CR-13-577679-B.  For the

following reasons, the undersigned recommends that the Petition be DISMISSED.

## I.  Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment

of a state court, factual determinations made by state courts are presumed correct unless rebutted

by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695

F.3d 439, 447 (6th Cir. 2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).  The

state appellate court summarized the facts underlying Thompson's conviction as follows:

> {¶ 2} In October 2013, Thompson was charged in a nine-count indictment arising from the death of Rafael Carter ("Carter").  Counts 1 and 2 charged him with aggravated murder.  Count 3 charged him with murder.  Counts 4 and 5 charged him with aggravated robbery.  Counts 6 and 7 charged him with felonious assault. Count 8 charged him with having a weapon while under disability.  Count 9 charged him with discharge of firearm on or near prohibited premises.  On March 13, 2014, the matter proceeded to a jury trial, at which the following evidence was adduced.

> {¶ 3} On the morning of April 29, 2013, Carter traveled with Marcos DeJesus ("DeJesus") to Saywell Avenue in Cleveland, Ohio.  DeJesus was driving an orange Saturn Ion and Carter was in the passenger seat.  DeJesus parked the vehicle on the street in front of a house located at 12347 Saywell Avenue.  After approximately five minutes, DeJesus exited the vehicle and walked across the street to a white house with yellow trim.  Moments later, an individual later identified by Kimberly Brickers ("Brickers") as Thompson, walked up to the passenger side of the vehicle, where Carter was sitting, raised his gun, and fired two shots at Carter.  Carter managed to get into the driver's seat of the car and drive away.  Thompson then flagged down an approaching Buick Regal, and jumped in as the car sped away.

> {¶ 4} Meanwhile, Carter continued to drive for a few blocks.  He eventually pulled over to the side of the road when he was no longer able to control the car because of his injuries.  Cleveland police officers, who were responding to an unrelated incident, observed the Saturn coming down the street with a shattered window and immediately responded to that car.  Upon their arrival, the officers discovered Carter near death in the driver's seat.  Carter was taken from the scene in ambulance to the hospital, where he was pronounced dead.  DeJesus arrived while officers were processing the crime scene.

> {¶ 5} DeJesus was taken downtown for an interview with detectives because of some inconsistencies in his rendition of events to the police.  Cleveland Police Detective Thomas Lynch ("Lynch") interviewed DeJesus about the evening before and the morning of Carter's death and had him complete a written statement.  DeJesus stated that Carter was his best friend.  He was with Carter in the orange Saturn on Saywell Avenue where they both smoked marijuana. DeJesus left the vehicle for one minute and the shooting occurred while he left. He described the shooter as wearing a black Nike tracksuit with a white stripe on the sides and a hood pulled over his head.  He further stated that the shooter fled east on Saywell Avenue.  The information provided by DeJesus was very

2

different than the information police gathered from Brickers and Christopher
Maddox ("Maddox"), two witnesses who live on Saywell Avenue.

{¶ 6} Brickers, who lives across the street from where the shooting occurred,
testified that she was outside on her porch waiting for a repairman when she
observed the orange Saturn park across the street from her home.  After several
minutes, she witnessed a male, later determined to be DeJesus, exit from the
driver's side of the vehicle and walk to the white house with yellow trim.  She
then observed Thompson walking down the sidewalk toward the Saturn.
Thompson was wearing a blue polo shirt and jeans.

{¶ 7} She turned her back momentarily and heard gunshots.  When she turned
back around, she observed the Saturn driving away and Thompson standing on
the sidewalk.  Thompson put his gun in his pocket and signaled for a dark purple
colored Buick to drive forward.  Thompson got into the Buick and that car drove
away in the same direction as the Saturn.  At trial, Brickers identified Thompson
as the individual who shot Carter.  She further identified a photograph of the deep
purple Buick as the vehicle she observed  Thompson get into moments after the
shooting.

{¶ 8} Maddox, another resident of Saywell Avenue, testified that on the morning
of the incident, he heard gunshots outside, which prompted him to call 911.
Maddox was looking outside his front window while on the phone with the 911
operator.  He observed a young man standing in his neighbor's driveway.  He then
observed a two-toned Buick pull up, the young man jump into the car, and the
Buick speed away.  Maddox described this to the operator as it was happening.

{¶ 9} In the course of their investigation, Cleveland police completed an
extraction report of Carter's cell phone.  From this report, Lynch obtained a phone
number for a contact titled "Little Marc."  Lynch learned from an interview with
Carter's girlfriend that DeJesus went by the nickname of "Little Marc."  The
phone number assigned to "Little Marc" was 216–800–2221, which was different
than the number DeJesus provided to homicide detectives the day of his
interview.  Detectives determined that one of the numbers belonged to DeJesus's
mother.  Detectives obtained extraction reports for both of these phone numbers
and learned that DeJesus's phone number was in fact 216–800–2221.  In looking
at the calls from this number on the morning of Carter's murder, detectives
observed several phone calls to and from Carter's cell phone and a large volume
of calls from 216–902–1407 (referred to as the "target phone number").  There
were 33 phone calls between DeJesus and the target phone number either before,
during, or after the time Carter was killed.  The first three or four phone calls
placed after Carter's murder were to the target phone number.

{¶ 10} Based on this information, Cleveland police detectives shifted their

3

investigation to identifying the user of the target phone number.  Lynch testified that the detectives utilized several databases to identify the user of that number. In addition to these databases, the detectives interviewed DeJesus about the target phone number. DeJesus initially stated he did not know that number.  When confronted with the phone records, however, DeJesus stated that number belonged to someone named "Jay the weed man."

{¶ 11} Detectives reached out to the Northern Ohio Law Enforcement Task Force ("NOLETF"), seeking assistance in identifying the target phone number and another phone number that appeared in the records.  Detectives were concerned about 216–925–xxxx because there were 169 phone calls between the target phone number and this number over the course of four days around the time of the murder.  The phone records revealed that this number belonged to Mary Corbin ("Corbin"), who was dating Thompson at the time of the murder.  The detectives' investigation revealed that Corbin owned a two-toned 2001 Buick Regal, which she allowed Thompson to use.

{¶ 12} Lynch testified that he was advised by Detective James Cudo ("Cudo"), who was working surveillance for NOLETF, that Thompson was the owner of the target phone number.  Cudo was conducting surveillance on Thompson's half-brother, Keith Ricks ("Ricks").  Ricks placed a call to the target phone number, which was recorded as a part of the wiretap.  There was also video that correlated to the phone call.  When the phone call was placed, a voice said, "Hey Kirk," and then a conversation followed regarding a car outside of the home. Cudo compared the video to a photograph of Thompson, and after listening to and observing the telephone call placed to the target phone number, he concluded that the individual in the video was Thompson.

{¶ 13} At trial, Cudo testified that he had additional time to compare Thompson's photograph with the video and was not 100 percent positive that Thompson was the individual in the video.  He was certain, however, that Thompson was a user of the target phone number.  Cudo further testified that as part of his investigation, he learned that Thompson's birthday is on May 31st.  He observed two text messages from Ricks to the target phone number, stating, "HBD" and "Bro."

{¶ 14} Lynch and his partner now focused their investigation on Thompson.  The detectives learned that Thompson had received a ticket a couple weeks after the murder while driving a 2001 Buick Regal.  The detectives realized that this vehicle matched the description of the vehicle used during the shooting.  The detectives put together a photo array, which included Thompson's BMV photograph.  Detectives showed the array to Brickers and Maddox. Brickers identified  Thompson's picture as the individual she observed walk up to the orange car, fire shots, get into the deep purple Buick, and then drive away.  She

4

also recognized a photograph of DeJesus as the individual who exited the orange Saturn moments before Thompson shot Carter. Maddox was unable to identify the shooter. He did note, however, that three of the individuals who were in the photo array looked similar to the man he observed standing in his neighbor's driveway the morning of the shooting. Maddox was further shown a photograph of a two-toned Buick. He identified this as the vehicle he witnessed pull up moments after the shooting, in which the shooter leaped into just prior to it leaving the scene.

{¶ 15} At trial, Lynch testified that he learned that he could utilize Facebook to search phone numbers. Subsequently, Lynch entered the target phone number into the search box on Facebook. This search returned only one name—Kirk Thompson.

{¶ 16} As a result of their investigation and after Brickers identified Thompson as the individual who murdered Carter, Thompson was arrested in Atlanta, Georgia by the U.S. Marshals and extradited to Ohio for Carter's murder.

{¶ 17} At the conclusion of trial, the jury found Thompson guilty of aggravated murder, with the firearm specifications (Count 1); murder, with the firearm specifications (Count 3); felonious assault, with the firearm specifications (Counts 6 and 7); and discharge of firearm on or near prohibited premises, with the firearm specifications (Count 9). The trial court found him guilty of having weapons while under disability (Count 8). The matter proceeded to sentencing on April 23, 2014.

{¶ 18} At the sentencing hearing, the court merged Counts 3, 6, 7, 8, and 9 into Count 1 for purposes of sentencing. The court sentenced Thompson to three years in prison on the firearm specification to be served consecutive and prior to life in prison on Count 1 (aggravated murder), with parole eligibility after 28 years.

*State v. Thompson,* 2015 WL 1120992 at *1-4 (Ohio App. 8th Dist. Mar. 12, 2015).

## II. Procedural History

### A.     Trial Court Proceedings

In October 2013, a Cuyahoga County Grand Jury charged Thompson with (1) two counts of aggravated murder in violation of Ohio Rev. Code ("O.R.C.") §2903.01(A) and §2903.01(B) (Counts One and Two); (2) one count of murder in violation of O.R.C. §2903.02(B) (Count

Three); (3) two counts of aggravated robbery in violation of O.R.C. §2911.01(A)(1) and §2911.01(A)(3) (Counts Four and Five); (4) two counts of felonious assault in violation of O.R.C. §2903.11(A)(1) and §2903.11(A)(2) (Counts Six and Seven); (5) one count of having weapons under disability in violation of O.R.C. §2923.13(A)(3) (Count Eight); and (6) one count of discharge of firearm on or near prohibited premises in violation of O.R.C. §2923.162(A)(3) (Count Nine).  (Doc. No. 7-1, Exh. 1.)  Each charge, except for Count Eight, carried two firearm specifications.  (*Id*.)  Thompson pled not guilty to all charges.  (Doc. No. 7-1, Exh. 2.)

Thompson waived his right to a jury trial for Count 8 (weapons under disability).  (Doc. No. 7-1, Exh. 4.)  Counts 2, 4, and 5 were dismissed prior to trial.  (Doc. No. 7-2, Tr. 19.)

The case proceeded to trial commencing March 13, 2014.  (Doc. No. 7-2, Tr. 22.)  Pursuant to Ohio. Crim. R. 29, Thompson moved for an acquittal at the close of the State's case, which the trial court denied.  (Doc. No. 7-8, Tr. 12, 13).  Thompson renewed his Ohio Crim. R. 29 Motion for Acquittal after the defense rested and the state trial court again denied the motion. (Doc. No. 7-8, Tr. 14.)  The jury found Thompson guilty of aggravated murder with a firearm specification (Count One), murder with a firearm specification (Count Three), felonious assault with a firearm specification (Counts Six and Seven), and discharge of firearm on or near prohibited premises with a firearm specification (Count Nine).  (*Id*. at Tr. 135-138.)  The trial court found Thompson guilty of weapons under disability (Count Eight).  (*Id*. at Tr. 141.)

The trial court conducted a sentencing hearing on April 23, 2014, at which time the court merged the murder, felonious assault, and discharge of firearm on or near prohibited premises convictions into the aggravated murder conviction.  (*Id*. at Tr. 172.)  Thompson was sentenced to 25 years to life for the aggravated murder conviction, plus one 3-year sentence for the firearm

6

specification; and 30 months for the weapons under disability conviction.  (*Id.*)  The trial court ordered the sentences for all convictions to be served concurrently, for an aggregate sentence of 28 years to life.  (*Id.*)

**B.      Direct Appeal**

On May 13, 2014, Thompson, through counsel, filed a Notice of Appeal with the Court of Appeals for the Eighth Appellate District ("state appellate court").  (Doc. No. 7-1, Exh. 6.)  In his appellate brief, Thompson raised the following assignments of error:

> I.      The trial court erred by convicting the appellant despite insufficient evidence.
>
> II.     Appellant's conviction is against the manifest weight of the evidence.
>
> III.    The trial court denied defendant due process when it found defendant guilty despite the evidence.
>
> IV.     Mr. Thompson received ineffective assistance of counsel.

(Doc. No. 7-1, Exh. 7.)  The State filed a brief in response.  (Doc. No. 7-1, Exh. 8.)

On March 12, 2015, the state appellate court affirmed Thompson's convictions and prison sentences.  (Doc. No. 7-1, Exh. 9.)  *See also State v. Thompson,* 2015 WL 1120992 (Ohio App. 8th Dist. Mar. 12, 2015).

On April 21, 2015, Thompson, *pro se*, filed a Notice of Appeal with the Supreme Court of Ohio.  (Doc. No. 7-1, Exh. 10.)  In his Memorandum in Support of Jurisdiction, Thompson raised the following Propositions of Law:

> I.      The Eighth District Court of Appeals misapplies the *Jackson v. Virginia* standard when affirming the Appellant's conviction despite insufficient evidence.
>
> II.     Appellant's conviction is against the manifest weight of the evidence.

7

III.    The trial court denied defendant due process when it found defendant guilty despite the evidence.

IV.    Mr. Thompson received ineffective assistance of counsel.

(Doc. No. 7-1, Exh. 11.)  The State did not file a response.  (Doc. No. 7-1, Exh. 153.)

On July 8, 2015, the Supreme Court of Ohio declined to accept jurisdiction of the appeal pursuant to S.Ct. Prac. R. 7.08(B)(4).  (Doc. No. 7-1, Exh. 13.)

**C.    Federal Habeas Petition**

On August 15, 2016,[1] Thompson filed a Petition for Writ of Habeas Corpus in this Court and asserted the following grounds for relief:

**GROUND ONE:** The Eighth District Court of Appeals misapplies the *Jackson v. Virginia* standard when affirming the Appellant's conviction despite insufficient evidence.

**GROUND TWO:** Appellant's conviction is against the manifest weight of the evidence.

**GROUND THREE:** The trial court denied Defendant Due Process when it found Defendant guilty despite the evidence.

**GROUND FOUR:** Mr. Thompson received ineffective assistance of counsel because counsel never investigated the location data of Mr. Thompson's cell phone.

(Doc. No. 1.)

On December 12, 2016, Warden Alan Lazaroff ("Respondent") filed his Return of Writ.

(Doc. No. 7.)  Thompson filed a Traverse on April 19, 2017.  (Doc. No. 10.)

---

[1]  Under the mailbox rule, the filing date for a *pro se* petition is the date a petitioner delivers it to prison authorities.  *See Houston v. Lack*, 487 U.S. 266 (1988).  While the Petition herein did not arrive at the Court for filing until September 1, 2016, Thompson states he placed it in the prison mailing system on August 15, 2016.  (Doc. No. 1 at 13.)  Thus, the Court will consider the Petition as filed on August 15, 2016.

8

## III.  Standard of Review

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The

relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to
> any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim–
>
>> (1) resulted in a decision that was contrary to, or involved an
>> unreasonable application of, clearly established Federal law, as
>> determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable
>> determination of the facts in light of the evidence presented in the State
>> court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings (as opposed to the

dicta) of the United States Supreme Court.  *See Parker v. Matthews*, 567 U.S. 37, 49 (2012);

*Renico v Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1865-1866 (2010); *Williams v. Taylor*, 529 U.S.

362, 412 (2000); *Shimel v. Warren,* 838 F.3d 685, 695 (6th Cir. 2016); *Ruimveld v. Birkett*, 404

F.3d 1006, 1010 (6th Cir. 2005).  Indeed, the Supreme Court has indicated that circuit precedent

does not constitute "clearly established Federal law, as determined by the Supreme Court."

*Parker*, 567 U.S. at 40.  *See also Lopez v. Smith*, ––– U.S. ––––, 135 S.Ct. 1, 4, 190 L.Ed.2d 1

(2014) (per curiam) ("Circuit precedent cannot 'refine or sharpen a general principle of Supreme

Court jurisprudence into a specific legal rule that this Court has not announced.' " (quoting

*Marshall v. Rodgers*, 569 U.S. 58, 64 (2013))).

9

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413.  By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id. See also Shimel*, 838 F.3d at 695.  However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor,* 529 U.S. at 411.  Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law. *Id.* at 410-12. "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 Fed. App'x 511, 516 (6th Cir. Jan. 10, 2006) (citing *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA. *Id.* at 786 (internal quotation marks omitted).  The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 785.  The Court noted that Section 2254(d) "reflects the view that habeas

10

corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id*. (internal quotation marks omitted).  Therefore, a petitioner "must show that the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786–87.  This is a very high standard, which the Supreme Court readily acknowledged. *See id.* at 786 ("If this standard is difficult to meet, that is because it is meant to be.")

### IV. Analysis of the Petition

**1.      Manifest Weight and Sufficiency of the Evidence (Grounds One and Two)**

In his first and second grounds for relief, Thompson asserts his convictions were not supported by substantial evidence and against the manifest weight of the evidence.  (Doc. No. 1 at 5, 6.)  Thompson based his argument on the following: (1) witness Kimberly Brickers "never testified to seeing the actual shooting," and therefore, "cannot say who is the shooter;" (2) witness Christopher Maddox was not able to positively identify the shooter when presented with a photo array by the police; (3) the photo array was "suggestive," as it was "based on Det. James Cudo's erroneous identification of petitioner;" (4) the "getaway vehicle was described in various colors by the eyewitnesses at trial;" (5) the high volume of phone calls between Thompson and Marcos DeJesus "prove nothing," and "do not place [Thompson] at the scene of the crime;" and (6) Detective James Cudo "became unconvinced" as to the identification of Thompson.  (Doc. No. 10 at 6-9.)

Respondent maintains the state appellate court "reasonably applied Ohio's equivalent to *Jackson v. Virginia, supra* and thoroughly rejected Thompson's sufficiency of the evidence

challenge."  (Doc. No. 7 at 12.)  Respondent argues the state appellate court acknowledged the "wealth of evidence" to support Thompson's convictions.  (*Id*. at 14.)  Further, with regards to Thompson's manifest weight of the evidence claim, Respondent asserts this claim is not cognizable for federal habeas corpus review.  (*Id*. at 16.)

As to Thompson's manifest weight of the evidence claim, this claim is rejected on the grounds that such claims are not cognizable on  federal habeas review.[2]  *See, e.g., Nash v. Eberlin*, 437 F.3d 519, 524 (6th Cir.2006); *accord Howard v. Tibbals*, 2014 WL 201481 at * 16 (N.D. Ohio Jan. 17, 2014); *Hess v. Eberlin*, 2006 WL 2090093 at *6 (S.D. Ohio Jan. 17, 2006).

To the extent Thompson raises a sufficiency of the evidence claim, the Court finds it to be without merit.  The state appellate court considered Thompson's sufficiency claim on direct appeal and rejected it as follows:

{¶ 20} In the first assignment of error, Thompson argues that there is insufficient evidence that he is the individual who killed Carter.

\*\*\*

{¶ 23} Thompson argues that his guilty verdict must be overturned because Brickers's identification was "shaky," the color identification of the Buick Regal was conflicting, and Cudo was uncertain that Thompson was the individual he observed while completing surveillance on Ricks.  The state,

---

[2]     As explained by the U.S. District for the Southern District of Ohio, "under Ohio law, a claim that a verdict was against the manifest weight of the evidence-as opposed to one based upon insufficient evidence-requires the appellate court to act as a 'thirteenth juror' and review the entire record, weigh the evidence, and consider the credibility of witnesses to determine whether 'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Hess v. Eberlin,* 2006 WL 2090093 at *7 (S.D. Ohio Jan 17, 2006), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (Ohio Ct. App. 1983).  Because a federal district court does "not function as an additional state appellate court, vested with the authority to conduct such an exhaustive review," this Court cannot consider whether Thompson's conviction was against the manifest weight of the evidence.  *Id.*

on the other hand, argues there was sufficient evidence presented at trial to sustain Thompson's convictions.  We agree.

{¶ 24} The state presented Brickers's eyewitness identification of Thompson as the shooter.  Brickers testified that she observed Thompson walking down Saywell Avenue toward the orange Saturn.  She turned around to go back into her house when she heard gunshots.  She immediately turned back around and observed the Saturn drive away with Thompson standing on the sidewalk.  She observed Thompson put a gun into his pocket and get into the front-passenger side of a deep purple-colored Buick, which sped away.

{¶ 25} Brickers provided a statement to Cleveland police detectives and was shown a photo array, in which she identified Thompson as the shooter. At trial, Brickers explained that she was not uncertain as to who the shooter was.  Rather, she merely stated that Thompson had a similar appearance to the male in the fourth position in the photo array.  Brickers also identified Thompson, at trial, as the person she observed holding the gun that morning, who then jumped into the Buick that drove away from the scene. Brickers also identified several photographs of the Buick Regal as the vehicle that picked up Thompson immediately after the shooting.

{¶ 26} Maddox testified that, after he heard gunshots, he looked outside his window to see a male standing in his neighbor's driveway.  A bluish-gray Buick Regal pulled up and the male jumped into that vehicle, which then sped away.  At trial, Maddox viewed several photographs of Corbin's Buick Regal and testified that her car was similar to the one he observed the shooter get into immediately after the shooting.  He noted that Corbin's vehicle was two-toned and so was the Buick from the morning of the shooting.

{¶ 27} Corbin testified that she was dating Thompson and allowed him to use her 2001 Buick Regal.  Corbin testified that her vehicle was black and silver.  Lynch testified that Thompson received a traffic ticket while driving a 2001 Buick, which was the same year, make, and model of the vehicle used on the morning of the shooting.  Lynch obtained pictures of Corbin's 2001 Buick Regal from National Vehicle Location Services ("NVLS") and testified that the vehicle appeared to be bluish-green in color on top, with a lighter color on the bottom, which had a special molding. Lynch testified that

> [t]he color of the vehicle changes.  I know it sounds crazy,
> but the color of the vehicle changes.  If you saw the picture
> from the NVLS, it looks bluish-green.  We attempted to
> have Detective Raynard capture it from different angles to

13

> show that it looks purple.  Mostly it looks purple.  If you
> step backward away from it, it will look black.  And if you
> step away from the rear, it will appear a blue-green color.

This explains the different descriptions as to the color of the vehicle.

{¶ 28} Furthermore, Thompson was identified as the user of the target phone number.  The target phone number is directly linked to Thompson by his own Facebook page.  Additionally, the detectives' analysis of the target phone number revealed a high volume of calls between Thompson and DeJesus on the morning of the incident.  The analysis also revealed a high volume of calls to Corbin.  The first person DeJesus called after the shooting is Thompson.  While Cudo was uncertain of his initial identification of Thompson as the person in the video, he was certain that Thompson was the user of the target phone number.  The state also presented evidence that Thompson fled after hearing that a warrant for his arrest was issued.  U.S. Marshals located him in Atlanta and arrested him.

{¶ 29} When viewing the foregoing evidence in a light most favorable to the state, we conclude that the state presented sufficient evidence to sustain Thompson's convictions.

*State v. Thompson,* 2015 WL 1120992 at *4-6

A petitioner who claims the evidence at trial was insufficient for a conviction must demonstrate that, "after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).  *See also Scott v. Mitchell*, 209 F.3d 854, 885 (6th Cir. 2000).  The role of the reviewing court in considering such a claim is limited:

> A reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court.  It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony.  An assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims.  The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim.

14

*Matthews v. Abramajtys*, 319 F.3d 780, 788-89 (6th Cir. 2003) (internal citations omitted).

Moreover, it is well established that '"attacks on witness credibility are simply challenges to the

quality of the government's evidence and not to the sufficiency of the evidence.'" *Martin v.

Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002) (quoting *United States v. Adamo*, 742 F.2d 927, 935

(6th Cir.1984)).

   Consistent with these principles, the Supreme Court has emphasized that habeas courts

must review sufficiency of the evidence claims with "double deference:"

> We have made clear that *Jackson* claims face a high bar in federal habeas
> proceedings because they are subject to two layers of judicial deference.  First, on
> direct appeal, 'it is the responsibility of the jury—not the court—to decide what
> conclusions should be drawn from evidence admitted at trial.  A reviewing court
> may set aside the jury's verdict on the ground of insufficient evidence only if no
> rational trier of fact could have agreed with the jury.'  *Cavazos v. Smith*, 565 U.S.
> 1, ——, 132 S.Ct. 2, 4, 181 L.Ed.2d 311 (2011) (per curiam).  And second, on
> habeas review, 'a federal court may not overturn a state court decision rejecting a
> sufficiency of the evidence challenge simply because the federal court disagrees
> with the state court. The federal court instead may do so only if the state court
> decision was 'objectively unreasonable.' " *Ibid*. (quoting *Renico v. Lett*,
> 559 U.S. 766, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. 650, 132 S.Ct. 2060, 2062, 182 L.Ed.2d 978 (2012).  Under this

standard, "we cannot rely simply upon our own personal conceptions of what evidentiary

showings would be sufficient to convince us of the petitioner's guilt," nor can "[w]e ... inquire

whether any rational trier of fact would conclude that petitioner ... is guilty of the offenses with

which he is charged." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).  Rather, a habeas

court must confine its review to determining whether the state court "was unreasonable in its

conclusion that a rational trier of fact could find [petitioner] guilty beyond a reasonable doubt

based on the evidence introduced at trial." *Id*. (emphasis in original) (citing *Knowles v.

Mirzayance*, 129 S.Ct. 1411, 1420 (2009)).

15

Upon careful review of the trial transcript, the Court finds the state appellate court reasonably determined Thompson's convictions were supported by substantial evidence.  In resolving this claim, the state appellate court accurately summarized the evidence of record and correctly identified applicable law.

As noted in the state appellate court decision, Kimberly Brickers testified at length regarding what she witnessed.  (Doc. No. 7-4, Tr. 32-99.)  On the day of the shooting, she was out on her front porch waiting for a handyman.  (*Id*. at Tr. 37.)  She noticed a burnt orange colored vehicle parked across the street, several houses down.  (*Id.* at Tr. 37-38.)  The vehicle then turned around, and parked across the street in front of her home.  (*Id*. at Tr. 38-39.)  Ms. Brickers testified the orange vehicle sat on the street for 5-10 minutes, and then a "tall boy" got out of the car and went into a yellow and white house on her street.  (*Id.* at Tr. 39-40.)  Ms. Brickers later identified this individual as Marcos DeJesus.  (Doc. No. 7-7, Tr. 133.)

Ms. Brickers then noticed a man, wearing a blue polo shirt and jeans, walking on the same side of the street the orange vehicle was parked.  (Doc. No. 7-4, Tr. 40, 41.)  At that point, she testified, she turned her back from the street.  (*Id*. at Tr. 42.)  Ms. Brickers testified she heard shots and turned back around.  (*Id*.)  She saw the orange vehicle pulling away and the man with the blue polo shirt standing on the sidewalk.  (*Id*.)  Ms. Brickers observed this individual put a gun in his pocket and signal with his hand.  (*Id*. at Tr. 43, 44.)  An "eggplant" colored Buick, which had been parked on the street, pulled forward.  (*Id*. at Tr. 44, 45.)  The man in the blue polo shirt got into the Buick and the vehicle drove off.  (*Id*. at Tr. 45.)

Ms. Brickers testified she later identified Thompson, through a photo array, as the man in the blue polo.  (*Id*. at Tr. 49-53.)  At trial, she identified both Thompson and the Buick he had

16

gotten into at the scene.  (*Id*. at Tr. 53, 55, 99.)

The State next presented the testimony of Christopher Maddox.  (*Id.* at Tr. 100.)  Mr. Maddox testified that, on the day of the shooting, he was in his house when he heard two gunshots.  (*Id*. at Tr. 106.)  He proceeded to call 9-1-1.  (*Id*. at Tr. 107.)  Mr. Maddox looked out his front window and saw a man standing in his neighbor's driveway.  (*Id*.)  Mr. Maddox stated the man was wearing a blue "jean outfit."  (*Id*. at Tr. 110.)  He saw a two-toned, grey-blue Buick pull up, and the man got into the vehicle.  (*Id*. at Tr. 109, 142.)  Mr. Maddox was not able to identify this man in a photo array.  (*Id*. at Tr. 124.)  However, he was able to identify a photograph of the Buick.  (*Id*. at Tr. 128-129.)

The State presented testimony from Mary Corbin, who was dating Thompson at the time of the murder.  (*Id*. at Tr. 199.)  Ms. Corbin testified when she was dating Thompson, she owned a black and silver 2001 Buick Regal.  (*Id*. at Tr. 202.)  She indicated she allowed Thompson to use her vehicle.  (*Id*.)

The State called Detective James Raynard, the officer who processed Ms. Corbin's 2001 Buick Regal.  (Doc. No. 7-6, Tr. 136, 150.)  Detective Raynard testified he referred to the Buick as "eggplant" colored in his report.  (*Id*. at Tr. 170.)  He further noted the vehicle was "a unique color in the fact that every little bit you moved or glance you gave it, it was a different color." (*Id*.)  At trial, he identified photographs of the Buick and testified it looked black in these photos. (*Id*. at Tr. 171.)

The State then called two detectives, who through their testimony, explained how they identified Thompson as the shooter and Ms. Corbin's Buick as the suspect vehicle.  Detective Thomas Lynch, with the Cleveland Police Department, testified he recovered the victim's cell

17

phone from the orange vehicle he was shot in.  (Doc. No. 7-7, Tr. 89.)  He was able to obtain the victim's call log history from this cell phone.  (*Id*. at Tr. 89-90.)  From this call log history, Detective Lynch determined Marcos DeJesus' phone number.  (*Id*. at Tr. 92.)  Detective Lynch proceeded to obtain DeJesus' cell phone records, and noticed a large volume of calls between DeJesus and what would later be identified as Thompson's phone number.  (*Id*. at Tr. 98, 102-103.)  These calls occurred before, during, and after the murder.  (*Id*. at Tr. 98)

At trial, Detective Lynch explained his investigation began to focus on the owner of the phone number DeJesus had repeatedly called the day of the murder.  (*Id*. at Tr. 100-101.)  He testified he reached out to Detective Cudo, with the Northern Ohio Law Enforcement Task Force, to assist him in identifying the owner of this target phone number.  (*Id*. at Tr.116-117.)  In addition, after the trial had commenced, Detective Lynch entered this target phone number into a search on Facebook, and Thompson's account was linked to this phone number.  (*Id*. at Tr.102-103.)

Detective James Cudo testified he had been conducting wiretap surveillance on an individual named Keith Ricks, and through his surveillance determined Thompson was an associate of Ricks.  (Doc. No. 7-6, Tr. 191, 199-200.)  He also conducted video surveillance of Ricks' residence during an April 16, 2013 phone call.  (*Id*. at Tr. 203.)  During this phone call, Ricks called the target phone number, address the individual on the other line as Kirk, and requested this individual check on a vehicle parked outside of his home.  (*Id*. at Tr. 205.)  In the corresponding video, an individual in a red jacket left the Ricks' residence at the time of this call.  (*Id*.)  Detective Cudo identified this individual as Thompson, by comparing a photograph of Thompson to the video.  (*Id*. at Tr. 206-207.)  At trial, Detective Cudo testified he had the

opportunity to review this video a week prior to the trial.  (*Id*. at Tr. 201-211.)  He indicated he

was "not sure that the individual in that video is Kirk Thompson without a doubt, but I am sure

that Kirk Thompson is the user of the cellular telephone number."  (*Id*. at Tr. 211.)  He testified

he was certain due to numerous other phone calls he had reviewed, which all supported this

conclusion.  (*Id*.)

Once the detectives were able to identify Thompson as the owner of the target phone

number, Detective Lynch accessed Thompson's driving record.  (Doc. No. 7-7, Tr. 118-119.)

Detective Lynch discovered Thompson had received a traffic citation while driving a 2001

Buick, which was registered to Mary Corbin.  (*Id*. at Tr.119-120.)  Detective Lynch testified he

inputted this vehicle's information into the National Vehicle Location Service ("NVLS"), which

revealed two photographs of the vehicle.  (*Id*.)  Upon review of these photographs, Detective

Lynch noted this vehicle corresponded to the witness descriptions of the suspect vehicle.  (*Id*. at

Tr. 120.)  When describing the color of Ms. Corbin's vehicle, Detective Lynch noted "the color

of the vehicle changes" depending upon the angle, ranging from purple, black, or blue green.

(*Id*. at Tr. 138.)

Detective Lynch testified he put together a photo array, which included Thompson.  (*Id*.

at Tr. 121.)  Christopher Maddox was unable to identify Thompson from this photo array, but

Kimberly Brickers was.  (*Id*. at Tr. 124, 130.)  Detective Lynch created another photo array,

which included a photo of Mary Corbin's Buick.  (*Id*. at Tr. 125.)  Christopher Maddox was able

to positively identify this Buick as the Buick at the scene of the crime.  (*Id*. at Tr. 124-125.)

Upon review of this evidence, the Court finds the state appellate court reasonably

concluded sufficient evidence supported the jury and court's findings as to each element of the

charges against Thompson.[3]  The victim was discovered by police in an orange vehicle with a gunshot wound in the abdomen.  (Doc. No. 7-4, Tr. 167-168.)  There is ample evidence it was Thompson who shot and killed the victim.  Ms. Brickers testified she saw an orange vehicle parked on her street the day of the murder.  (*Id.* at Tr. 38-39.)  She saw a man in a blue shirt and jeans, whom she later identified as Thompson, walking on the same side of the street as the orange vehicle.  (*Id.* at Tr. 40-41, 49-51, 53.)  She heard gunshots, saw the orange vehicle pulling away, and Thompson place a gun in his pocket.  (*Id.* at Tr. 42-44.)  Ms. Brickers saw Thompson enter an "eggplant" colored Buick and leave the scene.  (*Id.* at Tr. 44-45.)

Similarly, Mr. Maddox heard gunshots.  (*Id.* at Tr. 106.)  While he was on the phone with 9-1-1, he saw a man wearing a blue "jean outfit" standing in his neighbor's driveway.  (*Id.* at Tr.

---

[3]     At the time of Thompson's conviction, O.R.C. §2903.01(A) defined aggravated murder as "purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy."

O.R.C. §2903.02(B) defined murder as causing "the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree . . ."

O.R.C. §2903.11(A)(1) defined felonious assault as "knowingly . . . cause serious physical harm to another or to another's unborn."

O.R.C. §2923.13(A)(3) defined having weapons while under disability as "no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if . . . the person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse."

O.R.C. §2923.162(A)(3) defined discharge of firearm on or near prohibited premises as discharging "a firearm upon or over a public road or highway."

107-108, 110.)  Mr. Maddox saw this individual get into a two-toned, grey-blue Buick and leave the scene.  (*Id*. at Tr. 109, 142.)  While Mr. Maddox was not able to identify Thompson in the photo array, he was able to identify a photograph of the Buick he saw at the scene.  (*Id*. at Tr. 125, 128.)  Testimony from Mary Corbin, who had dated Thompson, reveals she often permitted Thompson to use her 2001 Buick Regal.  (*Id*. at Tr. 199, 202.)  It was not unreasonable for the state appellate court to conclude this eyewitness testimony was sufficient to establish the elements of the charges against Thompson.

Thompson argues the eyewitness testimony does not establish he was the shooter, as Ms. Brickers "never saw the actual shooting."  (Doc. No. 10 at 6.)  He also notes Mr. Maddox was not able to positively identify Thompson.  (*Id*.)  It is true Ms. Brickers did not testify she saw the bullet leave the gun in Thompson's hand and kill the victim.  However, she saw Thompson walk towards the orange vehicle, heard two gunshots, and saw Thompson place a gun in his pocket. The jury heard this evidence, and concluded it was Thompson who shot the victim.  The jury was permitted to draw this inference, in light of the fact the victim was found with gunshot wounds in an orange vehicle with a shattered window.  *See Coleman*, 132 S.Ct. at 2064 ("*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'").  As for Mr. Maddox, he acknowledged he was unable to positively identify Thompson in a photo array.  However, his testimony provides corroboration to Ms. Brickers' testimony, as he also heard gunshots and saw an individual in a blue outfit with jeans get into a Buick.

Thompson also suggests Ms. Brickers' photo array identification was somehow faulty, as it was "based on Det. James Cudo's erroneous [i]dentification of petitioner from a video taken

21

from earlier surveillance." (Doc. No. 10 at 6.)  The Court disagrees.  While Detective Cudo

testified he was "not sure that the individual in that video is Kirk Thompson without a doubt," he

was certain of Thompson's phone number. (Doc. No. 7-6, Tr. 211.)  Once Detectives Cudo and

Lynch determined it was Thompson who repeatedly called DeJesus, they accessed Thompson's

driving record, and obtained a photo of him for the photo array. (Doc. No. 7-7, Tr. 118, 121.)

Moreover, even if Detective Cudo was not certain it was Thompson in the video, Ms. Brickers

was certain it was Thompson who she saw at the scene, as she identified him through the photo

array and at trial. (Doc. No. 7-4, Tr. 49, 51, 53, 99.)

      Thompson is emphatic about the inconsistent color descriptions of the Buick automobile

at the scene. (Doc. No. 10 at 7.)  However, the varying descriptions of the color of the car were

addressed at length during the trial.  Detective Raynard, the officer who processed Ms. Corbin's

2001 Buick Regal, noted the vehicle was "a unique color in the fact that every little bit you

moved or glance you gave it, it was a different color." (Doc. No. 7-6, Tr.170.)  Similarly,

Detective Lynch noted "the color of the vehicle changes," ranging from purple, black, or blue

green, depending upon the angle. (Doc. No. 7-7, Tr. 138.)  Thompson also argues Mr. Maddox

never described the damage on the front portion of the Buick when identifying the vehicle.

(Doc. No. 10 at 7.)  However, Mr. Maddox was able to positively identify the car at trial, and in

addition, specifically described the custom molding on the vehicle. (Doc. No. 7-4, Tr. 128-129.)

      Thompson further asserts the phone call evidence, including the Facebook account linked

to the target phone number, "prove nothing," and do not place him at the scene of the crime.

(Doc. No. 10 at 8-9.)  However, the phone call evidence was not used to place Thompson at the

scene.  Rather, it was used to determine the identity of the individual who had repeatedly called

Marcos DeJesus around the time of the murder.  It was the eyewitness testimony from Ms.

Brickers and Mr. Maddox which placed Thompson at the scene.  Irrespective of the phone call

evidence, Ms. Brickers positively identified him as the shooter.

In sum, the Court finds the state appellate court reasonably applied clearly established

federal law when it considered Thompson's argument there was insufficient evidence to support

his convictions.  There is no basis for this Court to conclude that the state court decision in this

case was contrary to, or involved an unreasonable application of, clearly established federal law.

Accordingly, it is recommended Thompson's First Ground for Relief be denied.

**2.**      **Due Process (Ground Three)**

In his third ground for relief, Thompson argues the state trial court violated his due

process rights when it allowed the introduction of several pieces of evidence.  (Doc. No. 10 at

10.)  This evidence included (1) a text message; (2) a jail phone call; and (3) evidence from

Thompson's Facebook page.  (*Id.* at 11-12.)  Thompson asserts the state did not disclose its plan

to use this evidence until after the trial had commenced.  (*Id.*)  He contends "had this information

been disclosed, the defense could have changed its strategy or perhaps further discussed possible

plea agreements." (*Id.* at 12.)

Respondent maintains the "introduction of text messages, phone calls, and Facebook

page evidence did not fatally infect the fairness of Thompson's trial."  (Doc. No. 7 at 21.)

The Due Process Clause of the Fourteenth Amendment to the United States Constitution

prohibits any state from depriving "any person of life, liberty, or property, without due process

of law."  U.S. Const. Amend. XIV §1.  In the context of a criminal trial, the Supreme Court has

observed the denial of due process is "the failure to observe that fundamental fairness essential

23

to the very concept of justice." *Lisenba v. Califonia,* 314 U.S. 219, 236 (1941.)  This failure occurs when "the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." *Id.*

Generally, "alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review." *Moreland v. Bradshaw,* 699 F.3d 908, 923 (6th Cir. 2012).  However, the Supreme Court has acknowledged "erroneous evidentiary rulings can, in combination, rise to the level of a due process violation." *Montana v. Egelhoff,* 518 U.S. 37, 53 (1996).  This occurs when the state court evidentiary rulings "'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana,* 518 U.S. at 43).  A federal court may only grant habeas relief on the basis of a state court's evidentiary ruling when the circumstances are "'so egregious that it results in a denial of fundamental fairness,' thereby violating the Fourteenth Amendment's due process guarantee." *Burger v. Woods,* 515 Fed App'x 507, 509 (6th Cir. Feb. 20, 2013)(quoting *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir. 2003).  Thus, a due process claim premised on a state court evidentiary ruling faces a high bar, as "states have wide latitude with regard to evidentiary matters under the Due Process clause." *Wilson v. Sheldon,* 874 F.3d 470, 476 (6th Cir. 2017).

Here, Thompson raised the claim of a due process violation on direct appeal to both the state appellate court and the Supreme Court of Ohio.  (Doc. No. 7-1, Exh. 7, 11.)  The state appellate court considered this claim and rejected it as follows:

> {¶ 40} Thompson argues he was denied due process when the state did not disclose all of the evidence against him until after trial started.  He focuses on the following three instances: (1) Cudo's testimony regarding text messages between Thompson and Ricks; (2) testimony regarding

24

Thompson's jail phone calls; and (3) testimony regarding Thompson's Facebook profile page.  Thompson contends that his defense strategy was unfairly affected when these items were not timely disclosed.

*Text Messages*

{¶ 41} Thompson first complains that the state never disclosed to the defense that Cudo had observed texts from Ricks to Thompson on the day before his birthday that read, "HBD" and "Bro ."  On cross-examination, Cudo testified that these texts were never discussed with the state until the day before he testified.  He further testified that he never included these texts in a report to the state.  These texts were just one of the many pieces linking Thompson to the target phone number.  The state also presented evidence of the phone records, the recorded conversation between Ricks and Thompson, and the Facebook page that directly linked Thompson to the target phone number.  Therefore, Cudo's testimony regarding these texts did not lead to an unfair trial when the state had ample evidence to support the link between Thompson and the target telephone number.

*Jail Phone Calls*

{¶ 42} Thompson claims the state did not disclose to the defense that they would be using his jail phone calls until after the jury was empaneled.  At trial, the state introduced a jail phone call between Thompson and his mother.  The state maintains that on Monday, March 17, 2014, it provided the defense with copies of phone calls made by Thompson while he was in county jail.  The state focused on 13 calls, but only utilized one of these calls during trial.  The state did not utilize the calls until Thursday, March 20, 2014.  Therefore, Thompson was in possession of the calls for three days prior to the state utilizing them during trial.

{¶ 43} In addressing the matter, the trial court stated: "[t]he number one goal of any trial is to do justice.  And even—you know, many, many times deadlines are not adhered to by either side and evidence still comes in.  Let me think about this overnight and see.  I'll let you know in the morning."  On the next morning of trial, the court allowed the state to utilize the one phone call where Thompson asked his mother to take down his pictures from his Instagram account.  The trial court found that this evidence went "to consciousness of guilt."

*Thompson's Facebook Page*

{¶ 44} On Wednesday, March 19, 2014, the state gave the defense notice that it intended to use Thompson's Facebook page as evidence.  Thompson

claims that if he had this information sooner, it would have changed the defense strategy. Thompson's Facebook page linked Thompson to the target phone number. During trial, Lynch testified that he learned on March 19, 2013, that a Facebook profile page can be linked to a specific telephone number. When he typed the target phone number into the Facebook search bar, Thompson's Facebook page was the only result of that search. Lynch was unaware of this capability during his investigation. The state created copies of Thompson's Facebook page and immediately turned them over to defense counsel.

{¶ 45} It was clear, however, from the discovery that had been given to the defense, that the state was linking Thompson to the target phone number. The state did not withhold Thompson's Facebook page because Lynch discovered the link between the Facebook profile and the target phone number during the middle of trial. The state then disclosed this information to the defense. Moreover, Thompson was aware of the existence of the Facebook page because it was created in April 2013. The trial court allowed the Facebook page to be used in trial, stating that

> [w]ell, unfortunately everything doesn't come up before trial always because, as you mentioned, strategies change, new evidence comes, testimony changes, witnesses forget, they're afraid, they don't testify truthfully. All of that happens through every trial. And the finding of the phone number on Facebook was a fortuitous circumstance, frankly, that evolved through the preparation of a witness.

{¶ 46} Based on the foregoing, we find that the trial court did not deny Thompson a fair trial when it allowed the text messages, jail phone calls, and Facebook page as evidence. This evidence did not fatally infect the fairness of Thompson's trial.

*State v. Thompson,* 2015 WL 1120992 at *7-9.

The Court finds the state appellate court's determination was neither contrary to nor an unreasonable application of clearly established federal law.[4] As noted *supra*, a evidentiary

---

[4]    In his Traverse, Thompson cites to a bevy of Supreme Court cases which discuss the government's duty to disclose evidence. (Doc. No. 10 at 10.) However, the cases cited by Thompson relate to the government's suppression of evidence, and in particular, suppression of evidence that is exculpatory to the accused. *See Pennsylvania v. Ritchie,* 480 U.S. 39 (1987); *United States v. Bagley,* 473 U.S. 667

ruling can only be considered a due process violation when it results in "the denial of fundamental fairness." *Brown v. O'Dea,* 227 F.3d 642, 645 (6th Cir. 2000). "Whether the admission of prejudicial evidence constitutes a denial of fundamental fairness turns upon 'whether the evidence is material in the sense of a crucial, critical highly significant factor.'" *Id.* (quoting *Leverett v. Spears,* 877 F.2d 921, 925 (11th Cir. 1989). *See also Ege v. Yukins,* 485 F.3d 364, 375 (6th Cir. 2007).

Here, Thompson has not demonstrated the admission of these three pieces of evidence resulted in a denial of fundamental fairness. Thompson argues the portion of Detective Cudo's testimony regarding a "happy birthday" text message should have been excluded, as this specific text message was not provided by the State prior to his testimony. (Doc. No. 10 at 11; Doc. No. 7-6, Tr. 229-230.) This text message was used by the State to further prove Thompson was the owner of the target phone number, as it was sent to him the day before his birthday. (*See* Doc. No. 7-6, Tr. 212.) However, as the state appellate court correctly notes, this text message was one of the multiple pieces of evidence linking Thompson to the target phone number. Specifically, the State also presented phone records and recorded conversations, along with Detective Cudo's testimony, all of which linked Thompson to the phone number at issue. The inclusion of this lone text message, in the face of all the other pieces of evidence linking Thompson to the target phone number, did not result in any

---

(1985); *United States v. Valenzuela-Bernal,* 458 U.S. 858 (1982); *Brady v. Maryland,* 373 U.S. 83 (1963); *Strickler v. Greene,* 527 U.S. 263 (1999). Here, however, Thompson does not assert a *Brady* claim in these habeas proceedings, alleging the State suppressed the above evidence. Rather, the issue is whether the trial court's admission of the evidence, which had been provided to Thompson after the trial had commenced, violated due process.

fundamental unfairness.

Thompson next argues the recording of his jail phone call should have been excluded, as the State did not disclose the use of these calls as evidence until after the jury was empaneled.  (Doc. No. 10 at 11.)  However, the State provided Thompson with notice and copies of these phone calls on Monday, March 17, 2014.  (Doc. No. 7-6, Tr. 241.)  The State did not present these phone calls to the jury until Thursday, March 20, 2014.  (Doc. No. 7-7, Tr. 52.)  Thus, Thompson had possession of these calls for three days prior to their use at trial.  The state trial court made the judgment to admit one of these phone calls, noting the phone call "does kind of go to consciousness of guilt."  (*Id*. at Tr. 11.)  This was within the state trial court's discretion.  As the Sixth Circuit aptly noted, "second-guessing evidentiary rulings is not our job."  *Burger,* 515 Fed. App'x at 509.  Since Thompson cannot demonstrate the admission of this phone call rendered his trial fundamentally unfair, there is no violation of due process.

Finally, Thompson contends the screen captures of his Facebook page should have been excluded, as the State did not disclose this evidence until the day before it was presented to the jury.  (Doc. No. 10 at 11; Doc. No. 7-7, Tr. 12.)  To be clear, the State was not aware of the link between Thompson's Facebook account and the target phone number until the night before it was presented at trial.  (Doc. No. 7-7, Tr. 13.)  Thereupon, the State promptly disclosed this evidence to Thompson's defense counsel.  (*Id*. at Tr. 12-13.)  As the state appellate court correctly noted, Thompson was well aware the State was attempting to link him with the target phone number.  Moreover, this Facebook account was created in April 2013, meaning this information was available to Thompson as well.  (*Id*. at Tr. 13.)  As noted *supra*, the State presented a large amount of evidence linking Thompson to the target phone number, as well as

eyewitness reports placing him and the suspect vehicle at the crime.  The inclusion of these Facebook screen captures was simply one facet of the evidence against him, and therefore, their inclusion does not rise to the level of being fundamentally unfair.

Overall, in light of the wide latitude afforded to state courts with regards to evidentiary rulings, this Court cannot conclude Thompson's due process rights were violated.  Moreover, it is notable Thompson has not identified any clearly established federal law demonstrating his due process rights were violated under these circumstances.  As the admission of this evidence does not violate any clearly established federal law, there is no viable claim for habeas relief.

Accordingly, it is recommended Thompson's Third Ground for Relief be denied.

**3.     Ineffective Assistance of Counsel (Ground Four)**

In his fourth ground for relief, Thompson argues trial counsel was ineffective "because counsel never investigated the location data of Mr. Thompson's cell phone."  (Doc. No. 10 at 2.) He asserts "if the location data showed that the phone was out of the area then this could have been presented as a defense."  (*Id*. at 13.)  He further maintains counsel "was deficient in not cross-examining the detectives" regarding the cell phone location data.  (*Id*.)  Thompson insists the state appellate court erred in its conclusions, as this was "not a question of mere trial strategy but detrimental oversight that affected the outcome" of the trial.  (*Id*.)

Respondent argues the state appellate court considered this claim on direct appeal and reasonably rejected it.  (Doc. No. 7 at 24-25.)  Respondent also insists "Thompson has not demonstrated that but for counsel's alleged ineffectiveness, the result of the proceeding would have been different; he has not proven prejudice."  (*Id*. at 26.)

In order to establish ineffective assistance of counsel, a petitioner must demonstrate that

29

his counsel's conduct was so below acceptable standards of representation that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment to the United States Constitution. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Bavers*, 787 F.2d 1022 (6th Cir.1985).  A petitioner also must demonstrate that a trial counsel's performance prejudiced the petitioner's defense to such an extent that it rendered the proceeding unfair.  *Id*.  To establish prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  In other words, a counsel's deficient performance must have "caused the defendant to lose what he otherwise would probably have won" and it must have been "so manifestly ineffective that defeat was snatched from the hands of probable victory."  *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992).

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.  Mere disagreements by a defendant with tactics or strategies employed by counsel are not enough to support a claim of ineffective assistance of counsel and there is a presumption that the challenged conduct of a petitioner's counsel was a matter of strategy.  *Id.* at 689; *see also United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).

As explained by the United States Supreme Court:

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ——, 129 S.Ct. 1411, 173 L.Ed.2d 251. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ——, 129 S.Ct. 1411, 173 L.Ed.2d 251.  Federal

habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland* 's deferential standard.

*Harrington v. Richter*, 562 U.S. 86, 105, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (U.S.2011);

*accord Kennedy v. Warren*, 428 Fed. App'x 517, 520 (6th Cir. May 3, 2011); *accord Phillips v. Sheldon,* 2014 WL 185777 at * 14-15 (N.D. Ohio Jan. 16, 2014).

Thompson asserts trial counsel was ineffective due to the failure to (1) obtain location data for the targeted cell phone number and (2) elicit any testimony during cross examination of the detectives regarding cell phone location data.  (Doc. No. 10 at 13.)  Thompson raised this claim on direct appeal to both the state appellate court and the Supreme Court of Ohio.  (Doc. No. 7-1, Exh. 7, 11.)  The state appellate court rejected this claim as follows:

{¶ 50} In the instant case, Thompson contends that defense counsel should have requested the cellular tower location information to determine whether the target phone number was in the area of the murder.  However, if the records revealed that Thompson's cell phone was in the area of the murder, this would have been detrimental to his defense.  Thus, the decision to not seek the cellular location records was within the realm of defense counsel's trial strategy.  We note that Thompson has the burden of proof and must overcome the strong presumption that counsel's action might be sound trial strategy.  *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985).  It is not the duty of a reviewing court to analyze trial counsel's legal tactics and maneuvers.  *State v. Quinones*, 8th Dist. Cuyahoga No. 100928, 2014–Ohio–5544, ¶ 18, citing *State v. Gau*, 11th Dist. Ashtabula No.2005–A–0082, 2006–Ohio–6531, ¶ 35, citing *Strickland*.  Thompson cannot overcome the presumption that this was a sound trial strategy.

{¶ 51} Thompson further contends that defense counsel was ineffective because counsel did not cross-examine the state's witnesses regarding the cell phone tower locations.  He claims that this evidence could have tipped the balance in his favor.  However, the extent and scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel.  *State v. Patterson*, 8th Dist. Cuyahoga No. 100086, 2014–Ohio–1621, ¶ 33 ("the scope of

31

cross-examination falls within the realm of trial strategy and, therefore, debatable trial tactics do not establish ineffective assistance of counsel." *Id.*, citing *State v. Conway*, 109 Ohio St.3d 412, 2006–Ohio–2815, 848 N.E.2d 810).  Here, the record demonstrates that defense counsel extensively cross-examined Lynch regarding the cell phone records.

{¶ 52} After reviewing the record, we find that Thompson has not demonstrated "reasonable probability" that the outcome of the proceedings would have been different but for defense counsel's alleged deficient performance.

*State v. Thompson,* 2015 WL 1120992 at *9-10.

The Court finds the state appellate court's determination that defense counsel's representation was not ineffective was neither contrary to nor an unreasonable application of clearly established federal law.  The United States Supreme Court has emphasized that, in determining whether counsel performed deficiently under *Strickland*, "[w]e begin with the premise that 'under the circumstances, the challenged action[s] might be considered sound trial strategy."  *Cullen v. Pinholster*, 563 U.S. 170, 191 (2011) (quoting *Strickland*, 466 U.S. at 689).  Indeed, *Strickland* commands reviewing courts to "affirmatively entertain the range of possible 'reasons [defense] counsel may have had for proceeding as they did,'" *Pinholster*, 563 U.S. at 196, and "indulge [the] strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment."  *Strickland,* 466 U.S. at 689-90, 692.  *See also McMeans v. Brigano*, 228 F.3d 674, 682 (6th Cir. 2000) ("Strategic choices by counsel, while not necessarily those a federal judge in hindsight might make, do not rise to the level of a Sixth Amendment violation.")

Here, in light of Detective Cudo's testimony he was certain of Thompson's phone number, as well as the fact Thompson's Facebook account was linked to this same phone number, it was not unreasonable for the state appellate court to determine defense counsel made

a strategic decision to decline to develop evidence regarding the cell phone location. As the state appellate court remarked, defense counsel may have been attempting to avoid evidence this cell phone was in the area at the time of the murder. Given that one of the recurring themes of Thompson's defense was the eyewitnesses inaccurately identified Thompson and the Buick at the scene, this was a rational strategy.

The Court also finds it was not unreasonable for the state appellate court to determine Thompson had failed to establish prejudice under the second prong of *Strickland*; i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Indeed, had defense counsel inquired as the cell phone location data, and the evidence indicated the cell phone was in the area at the time of the murder, this would have weakened Thompson's defense, rather than strengthened it. Moreover, even if the cell phone location data indicated the cell phone was not in the area, there was also eyewitness testimony placing Thompson at the scene of the crime. Thus, Thompson cannot establish a "reasonable probability" the result would have been different. The state appellate court was not unreasonable in concluding that, but for defense counsel's decision to not obtain evidence regarding cell phone location data, Thompson would have been found not guilty.

Accordingly, the Court finds Thompson's Fourth Ground for Relief be denied.

### V. Request for Evidentiary Hearing

In his Traverse, Thompson requests an evidentiary hearing "for further fact finding." (Doc. No. 10 at 1.) He does not advance any further argument or explanation as to this request.

"[A] district court shall not hold an evidentiary hearing on a habeas claim unless the

petitioner, who failed to develop the factual basis of the claim in state court, 'shows that the claim relies on a factual predicate that could not have been previously discovered through the exercise of due diligence.'" *Freeman v. Trombley*, 483 Fed. App'x 51, 66 (6th Cir. 2012) (citing 28 U.S.C. § 2254(e)(2)(A)(ii)).  "Diligence for purposes of § 2254(e)(2) depends on 'whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court.' " *Robinson v. Howes*, 663 F.3d 819, 824 (6th Cir. 2012) (quoting *McAdoo v. Elo*, 365 F.3d 487, 500 (6th Cir.2004)).

The Court finds Thompson has failed to provide any basis for an evidentiary hearing. Thompson has not provided any reasoning for his request for an evidentiary hearing.  He has not specified what evidence or testimony he would present, nor has he provided any argument which demonstrates why an evidentiary hearing is required.

Accordingly, the Court finds an evidentiary hearing is not warranted.  Thompson's request should therefore be denied.

### VI. Conclusion

For all the reasons set forth above, it is recommended that the Petition be DENIED.


Date:  March 13, 2018                           *s/ Jonathan Greenberg*
                                                Jonathan D. Greenberg
                                                United States Magistrate Judge


### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**